1999 UT 67

**BOULDER MOUNTAIN LODGE, INC., Plaintiff and Appellant,**

v.

**TOWN OF BOULDER, Defendant and Appellee.**

No. 980102.

Supreme Court of Utah.

July 16, 1999.

Raymond Scott Berry, Salt Lake City, for plaintiff.

Larry S. Jenkins, Russell C. Skousen, Salt Lake City, for defendant.

DURHAM, Associate Chief Justice:

¶ 1 This is a case of statutory construction. Boulder Mountain Lodge, Inc. (the "Lodge") appeals from a grant of summary judgment in favor of Boulder City ("the town of Boulder"). The Lodge sought (1) a declaration that Boulder improperly withheld local consent to the Lodge's application for a restaurant liquor license issued by the Utah Department of Alcoholic Beverage Control (the "DABC"), and (2) a writ of mandamus directing the Boulder Town Council to consent to the Lodge's application. The trial court denied both requests. We affirm.

¶ 2 In 1994, the Lodge obtained a 17–acre commercial site in Boulder, Utah,[1] for the purpose of constructing and operating a high quality tourist lodge. Initial construction on the Lodge was completed in late 1994, and the Lodge formally opened for business in October 1994. The construction of restaurant facilities began in July 1995 and was completed in the spring of 1996.

¶ 3 On or about June 30, 1995, and prior to the Lodge's restaurant's opening, Mark Austin ("Austin"), a part owner and president of the Lodge, requested that the Boulder Town Council place on its July 6, 1995 meeting agenda the Lodge's request for "local consent" to the issuance of a restaurant liquor license by the DABC.[2] Specifically, the Lodge desired a signature on the "local consent" form provided by the DABC. In 1995, no restaurant in Boulder had a state liquor license, and Boulder had not adopted policies or procedures governing the issuance of local consent for restaurant liquor license applications.[3] However, nine months prior to the Lodge's request for local consent, the Town Council had conducted an anonymous survey of Boulder residents and determined that a majority of residents disfavored the issuance of restaurant liquor licenses in Boulder.[4]

¶ 4 The Town Council placed the Lodge's request for local consent on its meeting agenda. The Town Council also placed on the agenda a proposed liquor control ordinance referred to as "Ordinance Establishing Licenses for the Sale of Alcoholic Beverages."

¶ 5 Lodge representatives, as well as a large group of townspeople, attended the Town Council meeting on July 6. Members of the Town Council, Lodge representatives, and Boulder residents debated the issuance of liquor licenses at great length.

¶ 6 During the debate, Town Council members observed that a majority of residents did not favor the issuance of any restaurant liquor licenses; that other towns had denied all liquor permits because of the perceived adverse impact on their towns; that it would not be fair to grant local consent to the Lodge after the Council denied consent to a previous petitioner; and that other quality

---

1. Boulder is a small, rural town located in east Garfield County, Utah.

2. Before a restaurant may sell liquor, beer, or wine to its patrons, the restaurant must obtain a restaurant liquor license from the state. In order to obtain such a license, the restaurant must make an application to the DABC. The application must include the "written consent" of the local authority to the issuance of a liquor license. The procedures for applying for a restaurant liquor license are set forth in Utah Code Ann. § 32A–4–102 (1994).

3. Liquor sales in Boulder are limited to two small convenience stores that sell beer for off-premises consumption. State liquor stores are located in Wayne County, approximately 50 miles north of Boulder, and Escalante, approximately 30 miles southwest of Boulder.

4. In October 1994, a different Boulder restaurant had requested that the town grant its consent to an application for a restaurant liquor license, at which time the Town Council contemplated adopting an ordinance that would either allow or prohibit issuing local consent for the sale of alcohol. However, a policy was not adopted at that time because the requesting restaurant went out of business and its application lapsed.

restaurants in Boulder did not serve liquor and still did well.

¶ 7 After the debate, a Council member read the proposed "Ordinance Establishing Licenses for the Sale of Alcoholic Beverages", also designated "Ordinance 29." The Council adopted the ordinance by a unanimous vote, effective upon passage. While Ordinance 29 defines different types of licenses for the retail sale of beer, it authorizes only licenses to sell beer for *off-premises* consumption. Additionally, Ordinance 29 states that "Boulder Town shall not issue licenses to any individual or business to serve alcoholic beverages which contain more than 3.2% alcohol by weight to consume either on or off premises." The net effect of the Council's adoption of Ordinance 29 was a denial of the Lodge's request for local consent to issuance of a restaurant liquor license, and in fact a total ban on consent to any licenses to sell liquor or beer for on-premises consumption.

¶ 8 In February 1996, the Lodge again requested Boulder's consent to the issuance of a restaurant liquor license. The Town Council again denied the request for local consent, and Boulder's mayor sent a letter to the DABC indicating that the denial was based upon the adoption of Ordinance 29, the results of the survey of Boulder residents, and the fact that the previous request of a different restaurant owner had not been approved.

¶ 9 On March 29, 1996, the Lodge appeared before the DABC Commission (the "Commission") and asked that the Commission disregard the Town Council's refusal of consent because the Council had acted arbitrarily and capriciously. The Commission observed that it had historically required local consent and had never encountered an application involving a failure of consent. The Commission declined to override Boulder's decision and advised the Lodge to pursue judicial remedies.

¶ 10 On July 15, 1996, the Lodge filed a complaint for declaratory relief in the district court seeking a ruling that it was entitled to local consent and a writ of mandamus compelling Boulder to execute the local consent form. Boulder and the Lodge filed cross

motions for summary judgment, and the trial court granted Boulder's motion. The trial court held that "local consent" should be interpreted literally, thus giving Boulder broad discretion to withhold its consent to the issuance of restaurant liquor licenses. Accordingly, the lower court declined to issue a writ of mandamus to compel Boulder to execute the local form or exempt the Lodge from obtaining Boulder's consent to the issuance of a liquor license.

¶ 11 The Lodge now appeals. The issue before us is whether the local consent requirement of Utah Code Ann. § 32A–4–102(1)(c) gives the Boulder Town Council absolute discretion to withhold its consent to the issuance of state restaurant liquor licenses, thereby preventing any such licenses from being granted in Boulder. "By definition, a grant of summary judgment is based upon conclusions of law; therefore, we review the trial court's decision for correctness without deference." *Division of Unclaimed Property v. McKay Dee Credit Union,* 958 P.2d 234, 237 (Utah 1998). Also, because the question is one of statutory interpretation, we review the trial court's decision for correctness. *Mariemont Corp. v. White City Water Improvement Dist.,* 958 P.2d 222, 223 (Utah 1998).

¶ 12 It is well settled that a state has the authority to prohibit the sale of intoxicating liquors. *See Shaw v. Orem City,* 117 Utah 288, 292, 214 P.2d 888, 890 (1950). So, too, is the fact that the state "may delegate such power to cities." *Id.* However, rather than directly prohibit the sale of alcoholic beverages in any given locale, the Utah legislature has adopted a comprehensive and detailed scheme governing such sales in the state. The system is set forth in Title 32A of the Utah Code (1994 & Supp.1996), entitled "Alcoholic Beverages" (the "Act"). The title created the Commission to "conduct, license, and regulate the sale of alcoholic beverages in a manner and at prices that reasonably satisfy the public demand and protect public interest, including the rights of citizens who do not wish to be involved with alcoholic products." Utah Code Ann. § 32A–1–104(3).

¶ 13 The state has given some control to local authorities over the issuance of various types of liquor licenses. This case involves the requirements for the issuance of a restaurant liquor license as set forth in Utah Code Ann. §§ 32A–4–101 to –107. Section 32A–4–101(1) provides that "[b]efore any restaurant may sell or allow the consumption of liquor on its premises, it shall first obtain a license from the [Commission]." Section 32A–4–102 details the application requirements for a restaurant liquor license. One of twelve enumerated requirements is that the application must be accompanied by "written consent of the local authority." Utah Code Ann. § 32A–4–102(c). Consent is not defined in the Act, nor is the power of the local authority to consent or not consent otherwise mentioned. However, section 32A–1–105(25) defines "local authority" to include "the governing body of the city or town if the premises are located in an incorporated city or town." *Id.* § 32A–1–105(25)(b).

¶ 14 Boulder contends that the local consent provision should be read literally, thereby allowing the town to refuse to consent to any restaurant liquor license applications, and thus prevent the issuance of such licenses to restaurants in Boulder. Conversely, the Lodge argues that the local consent provision cannot be construed to permit Boulder to preclude the Lodge or any other restaurant from participating in the state's system of liquor sales.

¶ 15 When interpreting a statute, this Court's "primary goal is to give effect to the legislature's intent in light of the purpose the statute was meant to achieve." *Evans v. State*, 963 P.2d 177, 184 (Utah 1998). " 'The best evidence of the true intent and purpose of the Legislature in enacting the Act is the plain language of the Act.' " *State v. Hunt*, 906 P.2d 311, 313 (Utah 1995) (quoting *Jensen v. Intermountain Health Care, Inc.*, 679 P.2d 903, 906 (Utah 1984)).[5] Accordingly, we "look first to the plain language of the statute and assume that each of its terms was used advisedly. The language is therefore

read literally unless such a reading proves to be unreasonably confused or inoperable." *Surety Life Ins. Co. v. Smith*, 892 P.2d 1, 3 (Utah 1995) (citation omitted).

¶ 16 The statutory language requiring the written consent of the local authority to accompany an application for a state-issued liquor license is exceedingly plain on its face. While the state reserves ultimate control over licensing, the statutory requirement affords the local authority significant participation in licensing decisions. The requirement, in fact, gives local authorities "veto power" over the submission of applications to the Commission. Moreover, contrary to the Lodge's contention, a literal interpretation of the written consent requirement has not proven inoperable. There are many restaurants throughout Utah licensed to serve alcohol, and each was required to obtain the consent of a local authority. Additionally, when the Lodge challenged Boulder's denial of consent before the Commission, the Commission observed that it had never before been involved in a situation where a local authority denied consent.

¶ 17 Support for a literal interpretation of the local consent requirement is found in Utah Code Ann. § 10–8–42 (1992), which gives cities and towns the power to "prohibit, except as provided by law, any person from knowingly having in his possession any intoxicating liquor, and the manufacture, sale, keeping or storing for sale, offering or exposing for sale, importing, carrying, transporting, advertising, distributing, giving away, exchanging, dispensing or serving of intoxicating liquors." Although the Alcoholic Beverage Control Act supplants this section where the Act and this section conflict, the local consent requirement in the Act is not in conflict with this section but, rather, reaffirms the power given cities in section 10–8–42 to regulate liquor sales on a local level.

¶ 18 The Lodge also contends that a literal reading of the statute conflicts with other

5. We recognize, of course, that in the event we interpret statutory language in a manner that contravenes the "true intent and purpose" of the legislation, the legislature may respond by clarifying the statutory language. The policy questions at issue here—whether local communities should have the power to completely ban the sale of liquor for on-premises consumption—belong entirely in the legislative sphere.

provisions of the Utah Code. First, the Lodge argues that because no application for a state liquor license will be accepted without written local consent, local authorities can entirely preclude access to the state system of alcohol regulation and can in effect "opt-out" of the state system. The Lodge argues that because the state system exists to "satisfy public demand for alcoholic beverages," it is inconsistent to give local authorities such power.

¶ 19 We disagree. One goal of the state system is to *"reasonably* satisfy the public demand and protect the public interest, *including the rights of citizens who do not wish to be involved with alcoholic products."* Utah Code Ann. § 32A–1–104(3) (emphasis added). Prior to adopting its ordinance disallowing restaurant liquor licenses, Boulder conducted a survey of its residents to gauge public demand for access to liquor. The survey indicated that a majority of residents were opposed to the issuance of restaurant liquor licenses in Boulder. Boulder then—after a public hearing—adopted an ordinance intended to "reasonably" satisfy the demand for alcoholic beverages in Boulder,[6] as well as protect the interests of those who do not wish to be associated with such products. We see no way in which Boulder's action is contrary to this goal of the state system.

¶ 20 Second, the Lodge points out that section 32A–10–101(1)(a) expressly allows any local authority to "prohibit any retail sale of beer," but does not contain a parallel provision in the section governing restaurant liquor licenses. Thus, it argues, a limitation on local consent must be implied. Again, we disagree. The section governing the retail sale of beer is separate and distinct from those sections governing the retail sale of other alcoholic beverages. Chapter 10 of Title 32A, titled "Beer Licenses," is divided into two parts: Part 1, titled "General Provisions," and Part 2, titled "On–Premise Beer Retailer Licenses." Part 1 grants local authorities not only the express power to prohibit the retail sale of beer, but also the power to issue, suspend, and revoke licenses to general food stores and other establishments to sell beer at retail for off-premises

consumption. Utah Code Ann. § 32A–10–101(a), (d). Simply put, the statute requires only a local license, not a state license, to sell beer for off-premises consumption. Because this statute gives local authorities exclusive licensing authority over beer sales for off-premises consumption, the Act also expressly gives local authorities the complementary power to prohibit such sales.

¶ 21 However, Part 2, which governs beer licenses for *on-premises* consumption, requires a business to obtain a *state* license before it may sell beer. *See* Utah Code Ann. § 32A–10–201(1)(a). Moreover, section 32A–10–201(1)(b) requires an establishment to submit "written consent of the local authority" with its application. Because the state has retained licensing authority for on-premise consumption beer sales, subject to the local consent requirement, Part 2 of this chapter is entirely consistent with section 32A–4–102.

¶ 22 Finally, the Lodge argues that Boulder's adoption of Ordinance 29 violates Utah Code Ann. § 11–10–1 (1992), which governs business licenses for restaurants allowing consumption of liquor on premises. This section requires restaurants to obtain a *business* license approving the sale of alcoholic beverages from the local authority, in addition to obtaining a *restaurant liquor* license from the state. Section 11–10–1(5) requires each local authority to "set policy by written rules that establish criteria and procedures for granting, denying, suspending, or revoking [business] licenses issued under this chapter." The Lodge contends that Boulder's ordinance does not comport with this section. We agree that the Boulder ordinance does not set forth clearly defined policies and procedures governing the granting or denying of business licenses for restaurants serving liquor. However, in this case Boulder did not deny the Lodge's restaurant a business license.

¶ 23 Under our statutory scheme, both a local business license permitting the sale of alcoholic beverages and a state-issued restaurant liquor license are necessary. If the local authority grants a business license to

6. The ordinance authorized licenses for the retail sale of beer for off-premises consumption.

the restaurant, the license will serve as local consent for obtaining the state liquor license. The statutory scheme thus contemplates that a new restaurant will first apply to the local authority for a business license, and then apply to the state for a liquor license. Here the Lodge, prior to completion of construction on its restaurant, sought first to obtain the state liquor license and then to obtain the local business license. Had the Lodge initially applied for a business license and been denied based on the ordinance, we could then review Boulder's action in light of its alleged failure to comply with the requirements of section 11–10–1(5). Instead, because the Lodge only requested local consent for the liquor license application, we cannot say that Boulder's failure to adopt written rules regarding the granting or denying of business licenses entitles the Lodge to relief.

¶ 24  We therefore affirm the trial court's grant of summary judgment in favor of Boulder.

¶ 25  Chief Justice HOWE, Justice STEWART, Justice RUSSON, and Judge BENCH concur in Associate Chief Justice DURHAM's opinion.

¶ 26  Having disqualified himself, Justice ZIMMERMAN does not participate herein; Judge RUSSELL BENCH of the Court of Appeals sat.

