2008 UT 71

**DUE SOUTH, INC. dba Southern X-posure, Petitioner, Appellant, and Cross–Appellee,**

v.

**DEPARTMENT OF ALCOHOLIC BEV-ERAGE CONTROL, Respondent, Appellee, and Cross–Appellant.**

No. 20060971.

Supreme Court of Utah.

Oct. 10, 2008.

M. David Eckersley, Michael N. Zundel, Glenn R. Bronson, Salt Lake City, for appellant.

Mark L. Shurtleff, Att'y Gen., Thom D. Roberts, Asst. Att'y Gen., Salt Lake City, for appellee.

PARRISH, Justice:

## INTRODUCTION

¶ 1 Following two incidents in 2002, the Department of Alcoholic Beverage Control (the "DABC") found Due South, Inc. ("Due South") liable for three statutory violations of the Alcoholic Beverage Control Act. Due South appeals. Challenging, among other issues, the definition of "intoxication" as applied to Utah Code section 32A–12–216 (2001) by the DABC Commission (the "Com-

mission") and later by the district court in a trial de novo. The DABC cross-appeals, arguing that the district court wrongly conducted a trial de novo rather than reviewing the record created by the Commission and giving deference to the Commission's conclusion. We hold that the district court correctly conducted a trial de novo. However, the district court and the DABC misinterpreted Utah Code section 32A–12–216.

## BACKGROUND

¶2 In August 2002, the DABC initiated an informal administrative disciplinary proceeding against Due South, a private club liquor licensee doing business in Murray, Utah. The complaint was based on two incidents, which took place a few weeks apart. The first incident began at Due South's private club, Southern X-posure (the "Club"), and ended in a fatal drunk driving accident. The second incident was an undercover Serving Intoxicated Persons ("SIP") operation conducted by the State Bureau of Investigation. We recite the facts of the two incidents according to the district court's findings of fact.[1]

## I. THE KORTH AND HARRIS INCIDENT

¶3 The first incident occurred on April 25, 2002. Brian Korth and his friend, Johnny Harris, went to the Club around six in the evening. They stayed for about three and a half hours, playing pool, drinking beer, and consuming shots of liquor. During this time, Korth became intoxicated to the point that he was having trouble talking and forming sentences, as well as standing and walking. Korth and Harris left the bar in Korth's car and were subsequently involved in a one-car rollover accident in which Harris died. The Utah Highway Patrol ("UHP") responded to the accident and arrested Korth for driving while intoxicated. Korth's blood alcohol level was .22 at 11:20 p.m., approximately one hour after the accident, which meant that he likely consumed between eleven and fifteen drinks that evening.

## II. THE SIP INVESTIGATION

¶4 The second incident occurred a few weeks later when the State Bureau of Investigation conducted a SIP operation at the Club. At the conclusion of the SIP operation, the agents reported that they had observed five patrons who were allowed to become intoxicated or who were served alcohol while intoxicated. The agents' notes included specific observations regarding the physical signs of intoxication apparent in each of the patrons, such as unsteadiness or a flushed face. They also included conclusory observations regarding the likelihood that the patron would endanger himself or others through a "lack of judgment" or a possibility of stumbling and falling or bumping into another patron, as well as the likelihood of the patron endangering others if he were to drive.

## III. PROCEDURAL HISTORY

¶5 An informal administrative disciplinary proceeding was commenced in August 2002 before the Commission. It was conducted by a hearing officer appointed by the Commission. The hearing officer listened to the evidence and wrote a detailed sixty-six-page memorandum containing his findings of fact and conclusions of law. The Commission adopted these findings in whole in its final order.

¶6 As to the Korth and Harris incident, the final order concluded that Due South violated the over-serving statutes, Utah Code sections 32A–5–107(24)(h)(ii) and 32A–10–206(4)(b)(iii), by serving Korth and Harris when they were "apparently or obviously intoxicated" and section 32A–12–216 by permitting Korth and Harris to become intoxicated on the premises of the Club. As to the SIP incident, the Commission concluded that Due South violated section 32A–12–216 by allowing or permitting five patrons to become intoxicated. But the Commission found insufficient evidence that Due South served the patrons after they were intoxicated. Thus, the Commission did not find a violation of sections 32A–5–107(24)(h)(ii) and 32A–10–

---

1. *See State v. Anderson,* 910 P.2d 1229, 1230 (Utah 1996) ("In reviewing the trial court's rul-ing, we recite the facts in the light most favorable to the trial court's findings.").

206(4)(b)(iii), the over-serving statutes, in connection with the SIP operation.

¶ 7 Due South sought de novo judicial review in the district court, questioning the legal standard applied by the Commission and the sufficiency of the evidence presented. The DABC did not appeal any part of the Commission's order. Following a bench trial, the district court adopted the proposed findings of fact and conclusions of law submitted by the DABC and affirmed the Commission's findings and conclusions. Additionally, the district court held Due South liable for violating the over-serving statutes during the SIP operation by serving alcohol to five club members after they were intoxicated. This additional holding directly contradicted the Commission's conclusion that the DABC had not met its burden of proof for showing a violation of the over-serving statutes—a conclusion that the DABC had not appealed.

¶ 8 Due South appeals the district court's decision, presenting us with seven issues. Four of the issues require us to interpret Utah Code section 32A–12–216 to determine the following issues: (1) whether the prosecution may satisfy the "may endanger" element of the public intoxication statute by demonstrating a speculative possibility of harm or whether the prosecution must demonstrate a reasonable likelihood of harm, (2) whether Due South qualified as a "private place" within the meaning of the public intoxication statute, (3) whether section 32A–12–216 is unconstitutionally vague, and (4) whether the district court erred in concluding that Due South's patrons were intoxicated. The remaining three issues Due South presents on appeal are these: (1) whether the district court improperly allowed the DABC to present evidence that Due South violated sections 32A–5–107(24)(h)(ii) and 32A–10–206(4)(b)(iii) during the SIP operation after the Commission expressly exonerated Due South of these violations and the DABC did not appeal that ruling, (2) whether the district court erred in holding that Due South's conduct constituted a "grave" viola-

tion of Utah's over-serving laws, and (3) whether Due South was denied due process when the DABC failed to identify by name some of the patrons whom Due South allegedly over-served.

¶ 9 The DABC cross-appeals two issues regarding the standard of review applied by the district court: (1) whether the district court applied the wrong standard of review by conducting a trial de novo rather than deferring to the Commission, and (2) whether the district court applied the wrong method of review by conducting a trial de novo rather than reviewing the record created during the proceedings before the Commission.

¶ 10 We have jurisdiction over this appeal pursuant to Utah Code section 78A–3–102(3)(j) (Supp.2008).

## ANALYSIS

¶ 11 Our review of this case is limited to an examination of the district court's legal conclusions, which we review for correctness.[2] Because the standard of review shapes the rest of the discussion, we begin with the issues raised by the DABC's cross-appeal regarding the appropriate standard and method of review to be applied by a district court when reviewing a decision of the Commission. We then articulate the statutory violations that are properly before us on review and address the interpretation of Utah Code section 32A–12–216 (2001). Finally, we resolve the remaining two issues raised by Due South.

## I. THE DISTRICT COURT APPLIED THE PROPER STANDARD AND METHOD OF REVIEW

¶ 12 The DABC challenges both the standard of review and the method of review applied by the district court. Regarding the standard of review, the DABC argues that the district court should not have conducted a de novo review in accordance with the Utah Administrative Procedures Act (UAPA),[3] but

---

**2.** *See Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985) ("[W]e accord conclusions of law no particular deference, but review them for correctness.").

**3.** Utah Code Ann. § 63–46b–15(1)(a) (2004) ("The district courts have jurisdiction to review by trial de novo all final agency actions resulting from informal adjudicative proceedings ...."); *id.* § 63–46b–15(3)(a) ("The district court, with-

should have used the more deferential standard of review articulated in section 32A–1–120 of the Alcoholic Beverage Control Act.[4] Regarding the method of review, the DABC argues that the district court should have reviewed the record that was created during the Commission's informal adjudication. We disagree and hold that the district court applied both the proper standard and method of review to the Commission's decision.

¶ 13 Although both parties present persuasive arguments about which standard of review to apply when two applicable statutes conflict, we are ultimately convinced by a recent legislative amendment to Utah Code section 32A–1–120. The amendment clarifies that judicial review of disciplinary proceedings by the Commission shall occur "pursuant to the judicial review provisions of [UAPA] Sections 63–46b–14 through 63–46b–18."[5]

¶ 14 "The standard of review is a matter of procedural, rather than substantive, law."[6] " '[P]rocedural statutes enacted subsequent to the initiation of a suit which do not enlarge, eliminate, or destroy vested or contractual rights apply not only to future actions, but also to accrued and pending actions as well.' "[7] Moreover, "when the purpose of an amendment is to clarify the meaning of an earlier [statute], the amendment may be applied retroactively in pending actions."[8]

¶ 15 In *Kilpatrick v. Wiley*, the parties disagreed with the trial court's interpretation of the comparative fault statute and the jury

instructions given explaining the statute.[9] On appeal, we declined to reach the issue of whether the trial court had erroneously interpreted the comparative fault statute because the statute had been clarified by an amendment after trial, and we concluded that the amended version of the statute would be applicable on remand.[10] Similarly, in *Board of Equalization v. Utah State Tax Commission ex rel. Benchmark*, we applied the standard of review articulated in a recent statutory amendment despite the fact that the case commenced before the effective date of the amendment.[11] We reasoned that standards of review are procedural laws, which do not "enlarge, eliminate, or destroy" any vested or contractual rights of the parties.[12] Accordingly, they are retroactively applicable.[13]

¶ 16 Were we to remand this case to the district court, the standard of review articulated in the amendment to section 32A–1–120 would apply on remand and the district court would be obligated to review the Commission's decision pursuant to the judicial review provisions of UAPA. Because the standard of review on remand would be the same standard that the district court applied in the first instance, we need not address which standard of review would have prevailed when the terms of the Alcoholic Beverage Control Act and UAPA conflicted.

¶ 17 The plain language of UAPA addresses both the standard and the method of review to be applied in reviewing an informal agency decision. Section 63–46b–15(1)(a) provides that "[t]he district courts have juris-

out a jury, shall determine all questions of fact and law and any constitutional issue presented in the pleadings.").

4. *Id.* § 32A–1–120(2)(a)–(b) (2001) (providing that "[t]he findings of the commission on questions of fact [in a disciplinary proceeding] are final and not subject to review" and that "questions of fact include ultimate facts and findings of the commission on reasonableness and discretion" (internal quotation marks omitted)).

5. *Id.* § 32A–1–120(1) (Supp.2008).

6. *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 20, 54 P.3d 1054.

7. *Bd. of Equalization v. State Tax Comm'n ex rel. Benchmark Inc.*, 864 P.2d 882, 884 (Utah 1993)

(quoting *Pilcher v. Dep't of Soc. Servs.*, 663 P.2d 450, 455 (Utah 1983)).

8. *Kilpatrick v. Wiley*, 2001 UT 107, ¶ 59, 37 P.3d 1130 (emphasis omitted) (quoting *Dep't of Soc. Servs. v. Higgs*, 656 P.2d 998, 1000–01 (Utah 1982)).

9. *Id.* ¶ 57.

10. *Id.* ¶ 59.

11. 864 P.2d at 884.

12. *Id.*

13. *Id.*

diction to review by trial de novo all final agency actions resulting from informal adjudicative proceedings...." [14] Subsection (3)(a) provides that "[t]he district court, without a jury, shall determine *all questions of fact and law* ... presented in the pleadings." [15] Thus, in conducting a trial de novo, the district court applied the proper standard and method of review.

## II. THE DISTRICT COURT LACKED JURISDICTION TO CONSIDER DUE SOUTH'S LIABILITY FOR VIOLATING SECTIONS 32A–5–107(24)(h)(ii) AND 32A–10–206

■ ¶ 18 The district court inappropriately held Due South liable for violations of Utah Code sections 32A–5–107(24)(h)(ii) and 32A–10–206 during the SIP operation because the Commission acquitted Due South of violating these two statutes during the SIP operation and the DABC did not appeal that ruling.

¶ 19 The Commission's final order concluded that the DABC failed to prove by a preponderance of the evidence that any of the patrons observed during the SIP operation had been supplied with alcoholic beverages after becoming intoxicated. Accordingly, it found no violation of sections 32A–5–107(24)(h)(ii) or 32A–10–206 during the SIP operation, but did find Due South liable for violating section 32A–12–216. On appeal, the district court took evidence as to whether Due South violated sections 32A–5–107(24)(h)(ii) or 32A–10–206 during the SIP operation and concluded that it had.

¶ 20 The district court lacked jurisdiction to consider whether Due South violated sections 32A–5–107(24)(h)(ii) and 32A–10–206 during the SIP operation because the DABC did not appeal the Commission's conclusion regarding these violations. In fact, in the answer to Due South's petition for judicial review, the DABC expressly requested that the Commission's order be affirmed. Because the DABC did not appeal whether sections 32A–5–107(24)(h)(ii) or 32A–10–206 were violated during the SIP operation, the district court erred in taking evidence and considering whether these statutes were violated.

¶ 21 Moreover, we are troubled by the constitutional implications of what occurred. Violations of the Alcoholic Beverage Control Act carry criminal penalties.[16] For this reason, provisions of the Utah Criminal Code "relating to principles of construction, jurisdiction, venue, limitations of actions, multiple prosecutions, double jeopardy, burdens of proof, definitions, principles of criminal responsibility, punishments, and inchoate offenses apply to any criminal offense defined in this title, except as otherwise provided." [17] Section 76–1–403(2) clarifies that in the context of criminal liability, "[t]here is an acquittal if the prosecution resulted in a finding of not guilty by the trier of facts or in a determination that there was insufficient evidence to warrant conviction." [18] In his final report, the hearing officer concluded that the DABC "failed to show by a preponderance of the evidence that any [patron] was supplied with alcoholic beverages after any of them became intoxicated." The Commission's conclusion that Due South did not violate sections 32A–5–107(24)(h)(ii) or 32A–10–206 during the SIP operation amounts to an acquittal, and the district court erred by placing Due South in jeopardy a second time for the alleged violation of these statutes.

¶ 22 Because the district court lacked jurisdiction to consider sections 32A–5–107(24)(h)(ii) or 32A–10–206 in connection with the SIP operation, we do not address either of these statutes in connection with any of the remaining issues raised by Due South.

14. Utah Code Ann. § 63–46b–15(1)(a).

15. *Id.* § 63–46b–15(3)(a) (emphasis added).

16. Utah Code Ann. § 32A–12–104 (Supp.2007) ("Any person who violates this title is guilty of a class B misdemeanor, unless otherwise provided in this title.").

17. *Id.* § 32A–12–101 (2005).

18. *Id.* § 76–1–403(2) (2003).

III. THE PROPER INTERPRETATION AND APPLICATION OF SECTION 32A–12–216 REQUIRES CIRCUMSTANTIAL EVIDENCE OF ENDANGERMENT, RECOGNIZES PRIVATE CLUBS AS PRIVATE PLACES, AND INCLUDES A MENS REA REQUIREMENT

¶ 23 The parties disagree over the interpretation of Utah Code section 32A–12–216 (2001). At the time of the incidents in question, section 32A–12–216 provided as follows:

(1) The offense of intoxication shall be defined and punished in accordance with Section 76–9–701 of the Utah Criminal Code.

(2) A person may not permit any other person to become intoxicated, as defined in Section 76–9–701, or any intoxicated person to consume any alcoholic beverage in any premises of which the person is the owner, tenant or occupant. . . .

(3) A violation of Subsection (2) is an infraction.

¶ 24 The referenced statute, Utah Code section 76–9–701 (1999) (the "public intoxication statute") defined intoxication as follows:

A person is guilty of intoxication if he is under the influence of alcohol . . . to a degree that the person *may endanger* himself or another, in a *public place* or in a *private place* where he unreasonably disturbs other persons.[19]

¶ 25 Due South raises three questions regarding the interpretation and application of section 32A–12–216. First, whether the "may endanger" element of intoxication can be met by showing a speculative possibility of harm or whether it requires a reasonable likelihood of harm. Second, whether a private club is a "private place" within the meaning of the statute. Third, whether section 32A–12–216 is unconstitutionally vague because it requires a server to predict when an individual will become intoxicated.

*A. The "May Endanger" Element of Public Intoxication Requires a Reasonable Likelihood of Harm Based on the Circumstances*

■ ¶ 26 The district court concluded that the may endanger element of the public intoxication standard could be satisfied by showing a speculative possibility of harm without requiring any circumstantial evidence of endangerment. We hold that the may endanger element of the intoxication standard requires proof of a reasonable likelihood of harm based on the circumstances; a speculative possibility of harm is not sufficient. Our interpretation is consistent with the legislative intent, as indicated by the plain language of the statute. It is also consistent with our own case law as well as case law from other states.

■ ¶ 27 The argument that evidence of endangerment may be satisfied by a speculative possibility of harm conflicts with our principle of statutory interpretation that requires us to "avoid interpretations that will render portions of a statute superfluous or inoperative."[20] Requiring only a speculative possibility of harm would effectively eviscerate the endangerment requirement in the public intoxication statute for two reasons. First, an officer could always conceive of some speculative source of endangerment. This is apparent in the district court's findings of fact regarding the SIP operation. The court's endangerment finding for each patron contained some variant of the stock conclusion that the patron posed a risk of endangerment "from his unsteadiness, from falling, or from exercising diminished judgment due to the alcohol" or that the patron could "endanger himself or another if he were to drive a motor vehicle." This stock conclusion was applied to every patron regardless of his particular circumstances. Moreover, it could be applied to all persons exhibiting signs of intoxication regardless of whether they actually posed a risk of endangerment. Thus, accepting a speculative possibility of harm would effectively eliminate the endangerment requirement from the public intoxication standard.

19. Utah Code Ann. § 76–9–701(1) (emphasis added).

20. *Hall v. Utah State Dep't of Corr.*, 2001 UT 34, ¶ 15, 24 P.3d 958.

¶ 28 Second, an endangerment test based upon the speculative possibility of harm, rather than on the individual circumstances actually presented, necessarily conflates public intoxication with any blood alcohol content over the legal limit for driving.[21] This is so because any individual with a blood alcohol level over the legal limit would necessarily endanger others should he decide to get behind the wheel. This conflation is evidenced by the hearing officer's report in this case, in which he concluded that a person may endanger himself or another if there are indications that the person "obviously is, or appears to be impaired to the degree that he or she cannot operate a motor vehicle *without regard* to whether the person intends to do so." (Emphasis added.) Under this interpretation, every person with a .08 blood alcohol level poses a speculative possibility of harm and satisfies .the public intoxication standard. But this is not what the legislature intended. Had the legislature intended for the public intoxication standard and the DUI standard to be equivalent, it would have defined "intoxication" in section 32A–12–216 by referring to the DUI statute, not to the public intoxication statute. By referring to the public intoxication statute rather than the DUI statute, the legislature evinced an intent to require *both* intoxication *and* endangerment for a violation of section 32A–12–216. Thus, in order for the endangerment requirement to have any meaning, there must be a reasonable likelihood of endangerment based on the particular circumstances, rather than a speculative possibility of endangerment.

¶ 29 Requiring a circumstantial analysis of endangerment is consistent with the approach taken by states with similar statutes. For example, the Texas public intoxication statute employs the same may endanger requirement as Utah's public intoxication statute.[22] In applying the endangerment requirement, the Texas Court of Appeals stated that "physical manifestations of alcoholic consumption," such as slurred speech, blood shot eyes, and a smell of alcohol on the breath are "not sufficient to constitute public intoxication." [23] "Rather, the State must demonstrate proof of potential danger either to the appellant himself or to others." [24] The proof of potential danger requirement has been met in cases where the individual was walking down the middle of a street,[25] buying tire chains and indicating an intent to drive,[26] arguing in the middle of the street and resisting arrest,[27] and sleeping in a car in front of a lounge, presenting the likelihood that the individual would wake up and drive home.[28] But it was not met where the individual was in a private driveway leaning on the back of a vehicle.[29]

¶ 30 Requiring circumstantial evidence of danger is also consistent with our past case law. In *State v. Trane*, we evaluated whether officers had probable cause to arrest Trane for public intoxication without a warrant.[30] In that case, two officers responded to a disturbance complaint and found Trane outside a convenience store in the middle of the night. They immediately noticed that he had slurred speech, that he appeared un-

21. *See* Utah Code Ann. § 41–6a–502 (2005) (prohibiting driving under the influence of alcohol with a blood alcohol concentration of .08 or greater at the time of the test or at the time of operation).

22. Tex. Penal Code Ann. § 49.02 (2007) ("A person commits an offense [of public intoxication] if the person appears in a public place while intoxicated to the degree that the person may endanger the person or another.").

23. *Simpson v. State,* 886 S.W.2d 449, 455 (Tex. App.1994).

24. *Id.*

25. *Balli v. State,* 530 S.W.2d 123, 125 (Tex.Crim. App.1975), *overruled on other grounds by Chud-*

*leigh v. State,* 540 S.W.2d 314 (Tex.Crim.App. 1976).

26. *See Bentley v. State,* 535 S.W.2d 651, 653 (Tex.Crim.App.1976).

27. *Simpson,* 886 S.W.2d at 455.

28. *Dickey v. State,* 552 S.W.2d 467, 468 (Tex. Crim.App.1977).

29. *Commander v. State,* 748 S.W.2d 270, 272 (Tex.App.1988).

30. 2002 UT 97, ¶¶ 37–38, 57 P.3d 1052.

steady, and that he smelled of alcohol.[31] We rejected Trane's argument that there was no evidence of endangerment under the public intoxication statute because when the officers approached Trane, he "puffed his chest out [and] took a defensive posture similar to a boxer."[32] This aggressive behavior made the officers "fear[ ] for their safety."[33] Thus, in determining whether there was probable cause to believe that Trane was violating the public intoxication statute, we looked for actual evidence of endangerment based on the circumstances.

■ ¶ 31 In summary, we hold that in order to satisfy the may endanger element of the public intoxication statute, an officer must be able to articulate objective facts indicating a reasonable likelihood of endangerment based on the particular circumstances. Because this was not the standard applied by the district court, we remand this case for application of the proper standard.

### B. Due South Is a "Private Place" Within the Meaning of the Public Intoxication Statute

¶ 32 Due South and the DABC disagree over whether section 32A–12–216[34] incorporated the entire public intoxication definition from section 76–9–701, including the public place/private place distinction and, if it did, whether Due South is a private place within the meaning of the statute. We hold that section 32A–12–216 did incorporate the public place/private place distinction and that Due South is a private place.

■ ¶ 33 The DABC argues that section 32A–12–216 only incorporates the "level of intoxication in the public intoxication statute, not the public intoxication statute [itself]." This argument fails on closer analysis because the public intoxication statute establishes two different levels of intoxication, depending on whether the individual is in a private or public place.[35] Under the public intoxication statute, an individual is "guilty of intoxication" in a public place if he is "under the influence of alcohol ... to a degree that [he] may endanger himself or another."[36] And he is "guilty of intoxication" in a private place if he is "under the influence of alcohol ... to a degree that [he] ... unreasonably disturbs other persons."[37] Our principles of statutory construction direct us to "assume that the legislature used each term in the statute advisedly"[38] and to "interpret[ ] statutes to give meaning to all parts, and avoid[ ] rendering portions of the statute superfluous."[39] The DABC's interpretation runs contrary to these principles because it would require that we ignore half of the public intoxication statute. The public intoxication statute does not articulate a universal level of intoxication that is independent of the public place/private place distinction. Accordingly, we reject the DABC's argument and interpret section 32A–12–216 to incorporate the public place/private place distinction.

■ ¶ 34 Whether Due South, as a private club, is a private place within the meaning of the statute presents a more difficult issue that is not resolved by the plain language of the statute. When "there is doubt or uncertainty as to the meaning or applica-

31. *Id.* ¶¶ 2–4, 39.

32. *Id.* ¶ 40 (alteration in original).

33. *Id.*

34. In 2002, section 32A–12–216 read as follows:
(1) The offense of intoxication shall be defined and punished in accordance with Section 76–9–701 of the Utah Criminal Code.
(2) A person may not permit any other person to become intoxicated, as defined in Section 76–9–701, or any intoxicated person to consume any alcoholic beverage in any premises of which the person is the owner, tenant or occupant....
(3) A violation of Subsection (2) is an infraction.

35. In 2002, Utah Code section 76–9–701 read, "A person is guilty of intoxication if he is under the influence of alcohol ... to a degree that the person may endanger himself or another, in a public place or in a private place where he unreasonably disturbs other persons."

36. Utah Code Ann. § 76–9–701(1) (1999).

37. *Id.*

38. *Olsen v. Samuel McIntyre Inv. Co.*, 956 P.2d 257, 259 (Utah 1998).

39. *LKL Assocs., Inc. v. Farley*, 2004 UT 51, ¶ 7, 94 P.3d 279.

tion of the provisions of an act, it is appropriate to analyze the act in its entirety, in light of its objective, and to harmonize its provisions in accordance with its intent and purpose."[40]

¶ 35 One policy objective of the Alcoholic Beverage Control Act is to regulate the sale of alcoholic beverages in a manner that will "reasonably satisfy the public demand and protect the public interest, including the rights of citizens who do not wish to be involved with alcoholic products."[41] This objective requires a balancing of two opposing interests—the public demand for alcohol and the public interest in avoiding alcohol or its adverse consequences.

■ ¶ 36 Interpreting a private club as a private place within the meaning of the public intoxication statute best satisfies both of these objectives. First, in the alcohol regulatory scheme, there are "Public Liquor Licenses"[42] and "Private Club Liquor Licenses."[43] Public Liquor Licenses apply to places that the general public is likely to visit, such as restaurants,[44] airport lounges,[45] and banquets held at hotels, resorts, sports centers, or convention centers.[46] The Private Club Liquor Licenses apply to places that are not open to the general public. In order to enter a private club, an individual must be a member, have purchased a "visitor card," or be a guest of either a member of the club or a holder of a visitor card.[47] Furthermore, minors are not allowed into private clubs when alcohol is being served,[48] and any public advertising for a private club must clearly specify that the club is a "private club for members."[49] These restrictions on private clubs ensure that the general public will not be inadvertently exposed to the higher level of alcohol consumption that is allowed to occur in a private place under the public intoxication statute. Moreover, providing public venues where individuals can meet and share alcoholic drinks satisfies the public demand for alcohol, while still protecting the public interest. Since private clubs do not allow entrance without a membership, unwary citizens will not accidentally find themselves exposed to alcohol consumption.

¶ 37 In arguing that Due South is not a private place under the public intoxication statute, the DABC relies heavily on *Elks Lodges # 719 & # 2021 v. Department of Alcoholic Beverage Control*, in which we held that private liquor clubs were within the public sphere.[50] *Elks Lodges* is inapposite because the interests at stake and the analysis employed were demonstrably different than they are here. In *Elks Lodges*, the plaintiff argued that, as private clubs, the Elks Lodges could discriminate against women based on their constitutional right to freedom of association.[51] In contrast, no constitutional rights are involved in this case. The only issue regarding the private club status of Due South is whether Due South qualifies as a private place under the public intoxication statute. Unlike *Elks Lodges*, this issue does not require us to balance the rights of private individuals against the right of the State to regulate activities that take place in the public sphere. Instead, the analysis in this case is an issue of statutory interpretation to determine Due South's obligation within the Alcoholic Beverage Control Act. Thus, the *Elks Lodges* analysis is not applica-

40. *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1045 (Utah 1991).

41. Utah Code Ann. § 32A–1–104(4)(a) (2005); *see also Boulder Mountain Lodge, Inc. v. Town of Boulder*, 1999 UT 67, ¶ 19, 983 P.2d 570.

42. Utah Code Ann. §§ 32A–4–101 to –406.

43. *Id.* §§ 32A–5–101 to –107.

44. *Id.* §§ 32A–4–101 to –106; *id.* §§ 32A–4–301 to –307.

45. *Id.* §§ 32A–4–201 to –206.

46. *Id.* §§ 32A–4–401 to –406.

47. *Id.* § 32A–5–107(7).

48. *Id.* § 32A–5–107(8).

49. *Id.* § 32A–5–107(18).

50. 905 P.2d 1189, 1200 (Utah 1995) (holding that the Elks Lodges could not continue discriminating against women based on the First Amendment right of association because as liquor licensees, they were acting in the public, not the private sphere).

51. *Id.* at 1193.

ble and does not undermine our conclusion that Due South is a private place within the meaning of the public intoxication statute.

¶ 38 We note, however, that on remand the public place/private place distinction may have little practical effect because the instant that a patron leaves the premises of a private club, he is no longer in a private place. At that point, the public place standard for intoxication applies.

### C. Section 32A–12–216 Is Not Unconstitutionally Vague

¶ 39 Due South also argues that Utah Code section 32A–12–216 is unconstitutionally vague. A statute is unconstitutionally vague if "the terms of the law are so ambiguous that persons of ordinary intelligence are unable to determine whether their acts conform to the law,"[52] or if the ambiguity in the law "encourages arbitrary and erratic arrests and convictions."[53] We will construe a statute as constitutional wherever possible, resolving any reasonable doubt in favor of constitutionality.[54]

¶ 40 Due South argues that section 32A–12–216 encourages "arbitrary and erratic arrests and convictions" because the standard applied by the DABC for determining intoxication (based on a speculative possibility of harm to demonstrate endangerment) contains too much interpretive discretion. This argument is resolved by our earlier discussion, which rejects a speculative possibility of harm as the endangerment standard. The standard we announce, requiring circumstantial evidence of a reasonable likelihood that the individual "may endanger himself or another," cabins the DABC's interpretive discretion and does not encourage arbitrary and erratic arrests.

¶ 41 Second, Due South argues that the statute is ambiguous because it requires a server to predict when a person will become intoxicated and to avoid that result by refusing service before intoxication occurs. Due South reasons that persons of ordinary intelligence cannot determine whether their acts conform to the law under this standard because "no one, not even the scientists, can predict at what point a specific person will 'become intoxicated'" since everyone's body processes alcohol differently. The DABC, on the other hand, argues that because the general public can recognize the signs of intoxication, the statute is not unconstitutionally vague. Rather, it simply imposes liability on anyone that permits another to become intoxicated.

¶ 42 We hold that this statute is not unconstitutionally vague because it is not a strict liability statute, which means that servers are liable only if they intentionally, knowingly, or recklessly permit another to become intoxicated to a degree that they may endanger themselves or another. We interpret section 32A–12–216 to include a mens rea requirement because it carries criminal penalties.[55] Accordingly, the "principles of construction, . . . burdens of proof, definitions, principles of criminal responsibility, punishments, and inchoate offenses [from title 76 of the Criminal Code] apply."[56] Central to the concept of criminal liability is the principle that "[a] person is not guilty of an offense unless the person's conduct is prohibited by law" and "the person acts intentionally, knowingly, recklessly, with criminal negligence, or with a mental state otherwise specified in the statute defining the offense," unless the offense is a strict liability offense.[57] Furthermore, "[e]very offense not involving strict liability shall require a culpa-

---

52. *Id.* at 1202.

53. *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

54. *Soc'y of Separationists, Inc. v. Whitehead,* 870 P.2d 916, 920 (Utah 1993); *Logan v. Utah Power & Light Co.,* 796 P.2d 697, 700 (Utah 1990) ("When interpreting statutes, a central premise is that every effort should be made to interpret them as being consistent with the dictates of the constitution.").

55. Utah Code Ann. § 32A–12–104 (Supp.2007) ("Any person who violates [the Alcoholic Beverage Control Act] is guilty of a class B misdemeanor, unless otherwise provided in this title.").

56. *Id.* § 32A–12–101 (2005).

57. *Id.* § 76–2–101(1) (Supp.2007).

ble mental state." [58] An offense is only interpreted as a strict liability offense if "the statute defining the offense clearly indicates a legislative purpose to impose criminal responsibility for commission of the conduct prohibited by the statute without requiring proof of any culpable mental state." [59]

¶ 43 Section 32A–12–216 does not clearly indicate a legislative intent to impose criminal responsibility without proof of a culpable mental state. In the absence of an articulated mental state, it is appropriate to defer to the default mens rea requirements supplied by section 76–2–102. "[W]hen the definition of the offense does not specify a culpable mental state ... intent, knowledge or recklessness shall suffice to establish criminal responsibility." [60]

¶ 44 The court of appeals has taken this same approach in two cases construing analogous violations of the Alcoholic Beverage Control Act. First, in *State v. Souza,* the court of appeals interpreted the statute that prohibited furnishing or supplying alcohol to minors.[61] The statutory language at the time provided, "A person may not sell, offer to sell, or otherwise furnish or supply any alcoholic beverage or product to any person under the age of 21 years." [62] The court of appeals interpreted "furnish or supply" to mean that the defendant "(1) has some measure of *control* over the alcohol in question; (2) *knows* that whatever act he or she undertakes contributes to making alcohol available to minors; and (3) *intends or is reckless to* the fact that minors will accept or consume that alcohol." [63] The court reasoned that "requiring that accused persons must *know* that they were making alcohol ... available to a minor with the *intent or reasonably inferred expectation* that the minor will accept it," struck a balance between the protec-

tive purpose of the statute while "preventing inadvertent culpability." [64]

¶ 45 More explicitly, in *State v. Valdez,* the court of appeals interpreted subsection (2) of the same statute, which elevates the penalty for individuals who knowingly furnish or supply alcohol to a minor.[65] Part of the court's analysis compared subsection (2) to subsection (1), explaining that because subsection (1) "does not specifically state the requisite mens rea for the offense, the mens rea is supplied by Utah Code Ann. § 76–2–102 (1995)." [66]

¶ 46 In summary, section 32A–12–216 does not impose liability on servers who fail to accurately predict whether the next drink will cause a patron to become intoxicated. Instead, it imposes liability on a server who intentionally, knowingly, or recklessly permits a patron to become intoxicated to the point that the patron may endanger himself or another. Applying a mens rea requirement and requiring evidence that endangerment is reasonably likely to occur ensures that persons of ordinary intelligence can conform their actions to the requirements of the law by exercising reasonable judgment. As interpreted, section 32A–12–216 is not unconstitutionally vague.

## IV. THE TRIAL COURT ERRED IN FINDING THAT DUE SOUTH'S CONDUCT CONSTITUTED A "GRAVE" VIOLATION OF UTAH'S OVER–SERVING LAWS

¶ 47 Due South argues that even if this court finds that the Club did in fact allow individuals to become intoxicated on the premises, the violations were improperly classified as grave under the Utah Administrative Code. In light of the new standards

---

**58.** *Id.* § 76–2–102 (2003).

**59.** *Id.*

**60.** *Id.*

**61.** 846 P.2d 1313 (Utah Ct.App.1993).

**62.** *Id.* at 1315 (emphasis removed) (quoting Utah Code Ann. § 32A–12–203 (1991) ).

**63.** *Id.* at 1319.

**64.** *Id.* at 1320.

**65.** 933 P.2d 400, 401 (Utah Ct.App.1997); *see also* Utah Code Ann. § 32A–12–203(2) (Supp. 1996) ("[A] person who knowingly sells, offers to sell, or otherwise furnishes or supplies any alcoholic beverage or product to any person under the age of 21 years is guilty of a class A misdemeanor.").

**66.** *Valdez,* 933 P.2d at 402.

we articulate today, it is not clear whether Due South actually violated section 32A–12–216. We nevertheless address this issue in order to provide direction to the trial court on remand.

¶ 48 The DABC has established a schedule setting forth a range of penalties that can be imposed by the Commission for violating laws related to alcoholic beverages.[67] This schedule divides violations into four classifications: minor, moderate, serious, and grave. Grave violations are described as follows:

Violations of this category pose or potentially pose, a grave risk to public safety, health and welfare, or may involve fraud, deceit, willful concealment or misrepresentation of the facts, exclusion of competitors' products, unlawful tied house trade practices, commercial bribery, interfering or refusing to cooperate with authorized officials in the discharge of their duties, unlawful importations, or industry supplying liquor to persons other than the department and military installations.[68]

¶ 49 Each of the offenses listed as grave share common elements—they involve a deliberate, intentional violation of liquor regulations, and they are closely tied to other willful violations of law where the perpetrators know that their acts are wrongful or damaging. "Serious" violations, on the other hand, are described as those that "directly or indirectly affect or potentially affect the public safety, health and welfare, and involve minors." [69] Serious violations do not require the same deliberate or intentional violation of the law required for grave violations.

¶ 50 The facts in this case do not appear to indicate a grave violation absent evidence that the servers knowingly or willfully permitted patrons to become intoxicated to the point that they presented a reasonable likelihood of endangering themselves or others. Although allowing people to become intoxicated at a club surely has an effect or a potential effect on public safety and would certainly qualify for the serious classification, absent evidence of a willful violation of the law, this offense does not seem to rise to the level of the grave classification.

## V. THE DISTRICT COURT PROPERLY RULED THAT DUE SOUTH WAS NOT DENIED DUE PROCESS WHEN THE DABC FAILED TO IDENTIFY SOME OF THE PATRONS THAT WERE ALLEGEDLY OVER–SERVED

¶ 51 Due South claims that the DABC needed to identify each person allegedly over-served so that Due South could have a reasonable opportunity to challenge the allegations. To support this argument, Due South relies on the principle that "[a] defendant may obtain the identity and whereabouts of an informer if his testimony might be relevant to the defendant's case and justice would be best served by disclosure." [70] This principle, and the cases cited by Due South are inapposite. The DABC did not claim the government informant privilege. In fact, the DABC asserts that it does not know the identity of the individuals, and there is no allegation that the DABC is withholding the information in bad faith. Moreover, we doubt that the informant privilege would apply in this case since the "purpose of the privilege is to maintain the Government's channels of communication by shielding the identity of an informer from those who would have cause to resent his conduct." [71] The patrons in this case, however, were not government informers—they were individuals observed at Due South's private club. Furthermore, the ability to obtain the identity and whereabouts of an informer is limited to cases " '[w]here the disclosure of an informant's identity, or the contents of his communication, is relevant and helpful to the

---

67. Utah Admin. Code r. 81–1–6 (2002).

68. *Id.* r. 81–1–6(4)(d).

69. *Id.* r. 81–1–6(4)(c).

70. *United States v. Reardon,* 787 F.2d 512, 517 (10th Cir.1986); *see also DiBlasio v. Keane,* 932 F.2d 1038, 1041–42 (2d Cir.1991) (holding that the government must provide the identity of an informant where the informant's testimony was essential to the defendant's argument that he was entrapped).

71. *Roviaro v. United States,* 353 U.S. 53, 60 n. 8, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

defense of an accused, or is essential to a fair determination of a cause.' " [72]  Due South has not explained why disclosure of the patrons' identities is essential to a fair determination of this case.  Accordingly, we reject Due South's argument that its due process rights were violated by the DABC's failure to identify some of the patrons that were allegedly over-served.

### CONCLUSION

¶ 52 We remand this case to the district court to consider Due South's liability for violating Utah Code section 32A–12–216 in light of these interpretations.  In determining whether an individual is intoxicated under section 32A–12–216, we hold that the phrase "may endanger" as used in section 76–9–701 requires circumstantial evidence of a reasonable likelihood of harm.  We also hold that section 32A–12–216 incorporates the public place/private place distinction in the public intoxication statute and that a private club is a private place within the meaning of the statute.  Finally, we hold that section 32A–12–216 is not unconstitutionally vague.

¶ 53 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice NEHRING concur with Justice PARRISH'S opinion.

---

**72.**  *DiBlasio,* 932 F.2d at 1041 (quoting *Roviaro,*  353 U.S. at 60–61, 77 S.Ct. 623).